# In the United States Court of Federal Claims

No. 25-533
Filed: July 21, 2025
Re-issued: August 7, 2025[1]

———————————————————————

)
STERLING MEDICAL ASSOCIATES, INC.,    )
                                       )
                    *Plaintiff*,       )
                                       )
        v.                             )
                                       )
THE UNITED STATES,                     )
                                       )
                    *Defendant*,       )
                                       )
        and                            )
                                       )
GLOBAL SHIELD HEALTH CONSULTANTS,      )
LLC,                                   )
                                       )
                    *Defendant-Intervenor*.  )
———————————————————————  )

*Barbara Ann Duncombe*, Taft Stettinius and Hollister LLP, Dayton, OH, for Plaintiff Sterling Medical Associates, Inc.  *Suzanne Sumner* and *Brandon E. Dobyns*, Taft Stettinius and Hollister LLP, Dayton, OH, and *Rebecca Pearson* and *Alexander Gorelik*, Taft Stettinius and Hollister LLP, Washington, D.C., *of counsel*.

*An Hoang*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom was *Douglas K. Mickle*, Acting Deputy Director, *Patricia M. McCarthy*, Director, and *Yaakov M. Roth*, Acting Assistant Attorney General, for Defendant.  *Joshua A. Reyes*, Trial Attorney, Contract Litigation & Intellectual Property Division, U.S. Army Legal Services Agency, *of counsel*.

*Johnathan Malcom Bailey*, Cokinos Young, San Antonio, TX, with whom was *Kristin E. Zachman*, for Defendant-Intervenor Global Shield Health Consultants, LLC.

## OPINION AND ORDER

---

[1] The court initially filed this Opinion and Order under seal to allow the Parties to propose redactions.  The Parties submitted their proposed redactions, ECF No. 38, and the court has incorporated those proposed redactions and makes them with bracketed asterisks ("[ * * * ]") below.

Sterling Medical Associates, Inc. protests the Army's award of a contract to Global Shield Health Consultants, LLC to provide various medical professionals to support soldiers serving in Europe.  According to Sterling, the Army failed to follow the Solicitation's terms, did not explain its decision, applied unstated evaluation criteria, and treated offerors disparately.  But when reduced to their core, Sterling's arguments reflect its own subjective disagreement with the substance of the Army's evaluation rather than establishing that the Army's evaluation was arbitrary or capricious.  Because this court may not substitute its judgment for the Army's, coupled with the significant deference owed to the Army's weighing of the record before it, the court denies Sterling's motion for judgment on the administrative record and grants the Government's cross-motion for judgment on the administrative record.

## I.    Background

The military cannot function effectively without healthy soldiers.  Recognizing that truth, the Department of the Army ("the Army" or "the Agency") contracts with medical staffing companies to secure medical support for its personnel and their families deployed outside the continental United States ("OCONUS").  *See* Tab 25 at AR1486 (noting the need for qualified healthcare workers ("HCWs") at clinics in Europe, Africa, and the Middle East for the Army Medical Command and other Department of Defense ("DoD") agencies).  The objective is clear: to have "available at all times a healthy military force supported by a combat ready health care system," by providing "sustained health services support and force health protection to supported commands, the joint warfighter, families[,] and beneficiaries to enable readiness and conserve the fighting strength."  *Id.* at AR1487.

Sterling is the incumbent on the predecessor contract for these services, called the Army Direct Care Medical Services ("ADCMS") contract.[2]  Tab 39 at AR3157–58.  Because that contract was set to expire in May 2023, the Army issued Solicitation No. W9114F-22-R-0002 ("the Solicitation").  *See id.* at AR3157–58; Tab 25 at AR1139.

The Solicitation contemplates the award of an Indefinite Delivery Indefinite Quantity contract, with a one-year base period, and four one-year ordering periods.  Tab 25 at AR1453, AR1488; Tab 13 at AR238.  It promised the award to the offeror presenting the best value to the Army under a three-factor scheme: technical capability, performance risk (which the court and the Parties sometimes refer to as past performance), and price.  Tab 25 at AR1568.  Technical capability and performance risk were "significantly more important" than price.  *Id.*  The Solicitation also divided the procurement into phases.  During Phase I—the subject of this protest—the Army evaluated the offerors' performance risk.

The goal of the performance risk assessment was to "ascertain the probability" that the offeror could "successfully perform[]" the Solicitation's requirements.  *Id.* at AR1574.  That primarily involved looking at offerors' references, which would be assessed for recency, relevancy, quality, and performance confidence, and would result in a confidence rating.  *Id.* at AR1570, AR1574–75.  For each reference, offerors were required to submit a narrative explanation and a completed past performance questionnaire ("PPQ").  *Id.* at AR1555.

---

[2] The incumbent contract was Contract No. W9114F-18-D-0006.

Offerors had to submit between three and five contracts for review. *Id.* at AR1574. Those contracts could be with commercial entities or federal agencies, and "may include efforts performed by the prime [contractor] and any teaming arrangements projected to perform on any resultant contract." *Id.* For purposes of offerors' submissions, the Solicitation defined "contracts" to exclude individual delivery orders, task orders, blanket purchase agreements, or basic ordering agreements. *Id.* And for a joint venture ("JV"), the past performance of both the JV and the individual members would be considered. *Id.* Even if the JV did not have any past performance, the Army "shall consider the past performance of each party to the [JV]." *Id.* Offerors' submissions did not comprise the universe of past performance that the Army would consider: The Solicitation made clear the Army could also "consider a wide array of information from a variety of sources, but [was] not compelled to rely on all of the information available." *Id.*

The Army's evaluation proceeded in steps. First, the submitted contracts had to be recent. To be recent, each past performance reference had to cover at least 24 months of performance within the three years before the Solicitation's issue date. *Id.* If the reference was for recent performance, the Army would continue its evaluation. *Id.*

Second, the Army considered relevance. *Id.* Here the Army considered "similarity of service/support, complexity, dollar value, contract type, and degree of subcontract/teaming." *Id.* The Army then assigned one of the following adjectival ratings:

> **Very Relevant.** "Present/past performance effort involved essentially the same scope and magnitude of effort and complexities th[e] [S]olicitation requires."

> **Relevant.** "Present/past performance effort involved similar scope and magnitude of effort and complexities th[e] [S]olicitation requires."

> **Somewhat Relevant.** "Present/past performance effort involved some of the scope and magnitude of effort and complexities th[e] [S]olicitation requires."

> **Not Relevant.** "Present/past performance effort involved little or none of the scope and magnitude of effort and complexities th[e] [S]olicitation requires."

*Id.* at AR1575.

Third, the Army evaluated the quality of performance on each recent and relevant contract (the "Quality Assessment"). *Id.* The Quality Assessment "may" look at "all aspects of contract performance, both positive and negative." *Id.* Aspects of contract performance included "performance enhancements or problems, management enhancements or problems, . . . continuity of HCWs, shift fill rates, and quality of medical care workers provided." *Id.* Information would come from "[d]ocumented results from telephone interviews, Contractor

3

Performance Assessment Reporting System (CPARS), and other Government available sources." *Id*. This evaluation led to the final confidence rating:

> **Substantial Confidence.** "[T]he Government has a high expectation that the offeror will successfully perform the required effort."

> **Satisfactory Confidence.** "[T]he Government has a reasonable expectation that the offeror will successfully perform the required effort."

> **Limited Confidence.** "[T]he Government has a reasonable expectation that the offeror will successfully perform the required effort."

> **No Confidence.** "[T]he Government has no expectation that the offeror will be able to successfully perform the required effort."

> **Unknown Confidence.** "No recent/relevant performance record is available or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." An offeror with unknown confidence would "not be evaluated favorably or unfavorably on the factor of past contract performance."

*See id.* at AR1575–76.

Any bidder rated less than "Satisfactory" or "Unknown" confidence would be excluded from further consideration. *Id*. at AR1570. The rest would move on to the second phase of the evaluation. Sterling, Global, [ * * * ], and [ * * * ] submitted offers. Tabs 26–29 ([ * * * ] proposal); Tabs 30–33 (Global's proposal); Tabs 34–37 ([ * * * ] proposal); Tabs 38–41 (Sterling's proposal).

Sterling submitted five contract references. Tab 146b. It was the prime contractor for three of them: Victim Advocacy,[3] the ADCMS contract (the predecessor contract for the Solicitation), and Traumatic Brain Injury Healthcare Provider Services (the "TBI contract").[4] *Id*. at AR11043–44, AR11048. It was a subcontractor to Vesa Health & Technology Inc. ("Vesa") on the other two: one called the Coast Guard Multispecialty HCW Services (the "Coast Guard contract"), and the other called the Navy Japan Administrative Healthcare HCWs (the "Japan HCW contract"). *Id*. at AR11045–47.

Sterling's initial proposal survived the Competitive Range determination, although the proposal failed to "address filling vacancies due to inability to retain incumbent or pre-existing vacancies, which increases the risk of uninterrupted performance of services due to lengthy

---

[3] Contract No. W564KV20C0004.

[4] Contract No. W9114F-18-D-0009.

process to relocate someone[.]" Tab 42 at AR3712. That failure "represent[ed] a flaw that increase[d] the risk of unsuccessful contract performance. *Id.* In a full past performance evaluation, the Army assessed Sterling's submitted contracts and nothing else, and found that its past performance warranted a "Satisfactory Confidence" rating. Tab 65d at AR4758.

In any event, in April 2023, the Army awarded the contract to Global. Tab 77a at AR4821. Sterling protested the following month, and the GAO dismissed that protest because the Army took corrective action. Tab 81 at AR5239; Tab 90 at AR6101–02; Tab 96 at AR6121–22. That corrective action led to the Army awarding the contract to Global again in October 2023. Tab 103a at AR6409. Sterling protested again at the GAO. Tab 104 at AR6410–11. It challenged the Army's evaluation of proposals, its best-value trade off analysis, and Global's compliance with SAM registration requirements. Tab 115 at AR10209. The GAO dismissed because the Army decided to take corrective action. Tab 119 at AR10297–98.

Part of this corrective action included evaluation notices ("ENs"). *See, e.g.*, Tab 142a at AR10524. The Army sent each offeror ENs that opened further discussions and allowed offerors "to clarify the technical portion of [their] proposal[s] and . . . to revise the past performance and price portion of [their] proposal[s]." *Id.* Each offeror submitted clarifications and revised proposals in response to the ENs. *See, e.g.*, Tab 146 at AR11030.

As for Sterling, the Army sent two ENs regarding adverse past performance information stemming from two PPQs where Sterling worked as the prime contractor. Tabs 147, 148 at AR11358–79. One PPQ was from a task order that Sterling did not submit—it was for dental services OCONUS, and discussed a subsequent determination from the contracting officer who indicated he would not award Sterling another contract. Tab 147a at AR11361–62; Tab 149b at AR11377–78. Sterling responded to both ENs, addressed those PPQs with clarifications, and then protested at the GAO, challenging the Army's use of those PPQs. Tab 148a at AR11366; Tab 150a at AR11382; Tab 159 at AR13131. But the GAO dismissed that protest because the Army had not yet made any final determination or taken any final action regarding how to consider the PPQs. Tab 165 at AR13687–88.

The Army then sent Sterling six additional ENs regarding unfavorable past performance information from the five submitted references. Tab 174a at AR13936; Tab 176a at AR13952; Tab 178a at AR13967; Tab 180a at AR13976; Tab 182a at AR13987; Tab 184a at AR13998. Sterling responded to all six. Tab 175a at AR13945; Tab 177a at AR13961; Tab 179a at AR13972; Tab 181a at AR13981; Tab 183a at AR13992; Tab 185a at AR14003.

When the Army evaluated past performance based on the revised proposals and clarifications, it found Sterling's proposal wanting:

> Despite Sterling's extensive experience in this market, it has trends of poor and worsening performance. Sterling's most recent records have similar themes indicating that it does not consistently provide the required services. The noted failures include poor communication with the Government, failure to retain HCWs, failure to recruit replacement HCWs, failure to backfill personnel with extended absences, slow response to poor

> performance/behavioral issues, provision of candidates that do not
> result in placement, inefficient HCW onboarding and
> documentation errors, and poor management of a disperse
> workforce. These failures resulted in numerous unperformed
> hours, extended vacancies, removal of contract employees, and
> detrimental impact on patient care that created additional workload
> for military and civilian HCWs.

Tab 189d. The Army reached this conclusion after reviewing the ADCMS contract requirements, information provided in PPQs, responses to ENs, and information from CPARS reports. Ultimately, while Sterling at times performed well, the Army considered Sterling's performance to be of "Limited Confidence," and eliminated it from further consideration. Tab 191 at AR14158.

The Army kept evaluating proposals (although [ * * * ]withdrew from consideration) and awarded the ADCMS contract again to Global. Tab 222b at AR17610. Sterling protested at the GAO. The GAO denied the protest. Tab 203. Sterling then brought this suit. It asks the court to declare the Army's decision to eliminate Sterling from the procurement to be arbitrary or capricious, and "direct the Agency to readmit Sterling [] to the competition and re-evaluate proposals." ECF No. 1 at 36–37.

## II.     Standard of Review

In a post-award bid protest, the court's charge is familiar. A procurement decision may be set aside only if it "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4) (incorporating the standard set forth in 5 U.S.C. § 706(2)(A)). The task is two-fold, asking "(1) [whether] the procurement official's decision lacked a rational basis; or (2) [whether] the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)). So long as there is a "reasonable basis for the agency's action, the court should stay its hand," *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)), and verify only that the record supplies a "coherent and reasonable explanation" of the path taken, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). The court does not search for a "better" or "more correct" way to run the procurement. *IAP World Servs., Inc. v. United States*, 153 Fed. Cl. 564, 567 (2021) (citations omitted). Nor does it second-guess a reasoned judgment of the agency simply because a disappointed bidder harbors a different view. *Off. Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020).

That deference, though broad, is not without limit. A decision crosses the line when the agency "entirely failed to consider an important aspect of the problem," relied on reasoning that "runs counter to the evidence," or produced conclusions "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The "disappointed bidder bears [the] heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc.*

*v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). Even then, error alone does not suffice; the protester must also demonstrate prejudice, which is "a substantial chance it would have received the contract but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996). Failing that double showing, the agency's judgment—backed by the "substantial discretion" procurement officials enjoy, *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)—remains undisturbed.

## III. Discussion

Sterling makes four main arguments. First, it argues that the Army failed to follow the terms of the Solicitation. ECF No. 29 at 9. Second, it asserts the Army failed to document its decision-making. *Id.* at 18. Third, Sterling contends the Army relied on unstated evaluation criteria during its performance risk assessment. *Id.* at 15. And finally, it argues the Army treated offerors disparately. *Id.* at 19.

Sterling's attacks fail. The record shows that the Army appropriately weighed the information before it and drew a rational line from facts to outcome.

### A.    The Army followed the Solicitation's requirements.

Sterling's argument that the Army failed to follow the Solicitation's requirements is composed of three sub-arguments: (1) the Army focused too much on the negative parts of its past performance; (2) the Army "weighed past performance information from task orders more heavily than past performance from contracts, even if the task order did not meet the relevancy requirements of the Solicitation"; and (3) the Army "disregarded past performance information from work Sterling . . . performed as a subcontractor." *Id.* at 11.

Before turning to the merits of these arguments, the court lays out a few points that underlie much of its analysis. Agencies must evaluate proposals and make awards in accordance with the solicitation's criteria. *Firstline Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 388 (2011) (citing 48 C.F.R. §§ 15.101–1(b)(1), 15.305(a)); *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 47–48 (2009) ("It is 'hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.'" (quoting *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)). It is also true that "agencies cannot evaluate proposals based on criteria that are not disclosed in the solicitation." *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 560 (2017) (citing *NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015)). And "where appropriate, [the agency] must disclose the factors' relative importance." *Banknote Corp.*, 56 Fed. Cl. at 386–87 (citations omitted).

That said, "agency evaluation personnel are given great discretion in determining the scope of an evaluation factor." *Forestry Survs. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999). So "an agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." *Id.* That discretion is especially true in best value procurements. *E.W. Bliss*, 77 F.3d at 449 (explaining that "[p]rocurement officials have substantial discretion to determine which proposal

represents the best value for the government"); *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 672 (2023) (explaining how "[a]n agency's award decision is 'least vulnerable to challenge when based upon a best value determination'" (quoting *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010)). At bottom, the agency must have acted rationally in the exercise of its discretion. *See Impresa*, 238 F.3d at 1333 (citations omitted).

                1.    <u>The Army did not irrationally assess Sterling's past performance.</u>

Sterling's initial complaint with the past performance evaluation focuses on the Army's purported disproportionate attention on negative information and failure to give due weight to favorable aspects of its record. According to Sterling, the Army "emphasiz[ed] the most negative information" and "ignore[ed] (or downplay[ed]) anything positive" in its review. ECF No. 29 at 11–12. And Sterling asserts that "[p]ositive comments in the past performance references and CPARS were given a mere mention, and then almost always immediately discounted." *Id*. at 11. Similarly, Sterling argues that "[w]hether old or new, the Army focused on the negative, giving short shift to anything positive." ECF No. 31 at 6.[5] To the extent these arguments complain about the relative weight the Army gave to Sterling's various performance records, that is not a basis for this court to disturb the evaluation. *DynCorp Int'l, LLC v. United States*, 134 Fed. Cl. 537, 539 (2017).

Sterling focuses primarily on the Quality Assessment stage of the Phase I evaluation. ECF No. 29 at 10–11. In it, the Army evaluated "the quality of the Offeror's . . . [p]ast performance . . . on those recent efforts that were determined relevant by determining how well the contractor performed on the contracts." Tab 25 at AR1575. This part of the evaluation "may include a review of all aspects of contract performance, both positive and negative, including but not limited to performance enhancements or problems, management enhancements or problems, timeliness of proposal submission, continuity of HCWs, shift fill rates, and quality of medical care workers provided." *Id.* The Army would assess "[d]ocumented results from telephone interviews, [CPARS], and other Government available sources." *Id*. Here, the Army examined Sterling's extensive record and arrived at a reasonable conclusion. In other words, the Army followed the Solicitation.

Start with the Victim Advocacy contract. The PPQ found Sterling's performance "Satisfactory" because it "provide[d] the required services in a timely manner" and did not "suffer[] interruptions." Tab 189d at AR14130. But there were "numerous instances where" positions were "left . . . open for several weeks." *Id*. Communication was poor, too. *Id*. Problems worsened. The contracting officer explained that if he "were to write a PPQ now he would assign lower ratings due to the vacancies." *Id*. at AR14132. CPARS records reflected a similar sentiment. In the end, the Victim Advocacy contract left the Army with "limited confidence in [Sterling's] ability to perform services." *Id*. at AR14133. Based on the record, that rating is neither arbitrary nor capricious.

---

[5] Sterling also argues that this approach "was especially stark in comparison to . . . other offerors." ECF No. 29 at 12. The court addresses this disparate treatment argument below. *See* Section III.A.4.

Turn now to the ADCMS predecessor contract on which Sterling is the incumbent. Because the initial PPQ was completed in April 2022 and the second round of evaluations occurred in November 2024, the Army reviewed more recent CPARS—as permitted by the Solicitation. *Id*. AR14134. The Army acknowledged the PPQ's praise of Sterling's performance. Indeed, the "overall ratings were Satisfactory," and "some individual items" were scored as "Very Good." *Id*. And the PPQ noted that "Sterling has placed providers in positions as required by the overall contractual fill rate. Sterling has responded when necessary to performance issues to resolve them. Sterling has been cooperative and flexible when necessary to support changing requirements. Sterling managed [a system changeover] with minimal disruptions to operations." *Id*. In fact, "Sterling did not have adverse performance ratings" for the incumbent contract before September 30, 2020. *Id*.

But from October 1, 2020, to March 31, 2024, there were "15 records with one or more Marginal and/or Unsatisfactory ratings on nine . . . different task orders." *Id*. "The frequency of adverse ratings has increased over time." *Id*. And while Sterling "successfully provided services" for a few of the labor categories, "[t]he CPAR[S] with negative ratings have consistent themes[.]" *Id*. at AR14135. Those themes included extensive vacancies "with thousands of unperformed hours, no backfill providers for extended absences, ineffective corrective action plans, submission of [poor] candidates . . . , [a] failure to comply with reporting requirements, [and] delays in communication from Sterling." *Id*. Several providers were even "removed from positions for poor performance." *Id*. "Sterling's continued failures . . . resulted in the Assessing Official noting that he *would not* recommend Sterling for similar requirements." *Id*. at AR14136 (emphasis in original).

The same trend appeared in the other evaluations as well. The Army considered the positive ratings and then ran through the laundry list of poor feedback. Sterling earned "an overall 'Very Good' rating for performance" on the TBI contract. *Id*. at AR14140–41. It "responded when necessary to performance issues to resolve them" and Sterling was "cooperative [and] flexible when necessary to support changing requirements." *Id*. Sterling also "managed . . . [a] system changeover with minimal disruptions to operations." *Id*. But "CPAR[S] with negative ratings and adverse comments" revealed "a variety of performance failures, across multiple task orders." *Id*. at AR14145. Sterling failed to "effectively recruit and retain employees," resulting "in excessively long vacancies with thousands of unperformed hours." *Id*. at AR14145–46.

As for the Coast Guard contract, Sterling earned a "Satisfactory" rating, but the contracting officer's representative ("COR") "would not award Sterling another contract because the 'contractor was not proactive at managing employee conflict or poor performance.'" *Id*. at AR14147. Its "marginal" ratings regarding fill rates and poor performances were "consistent with other PPQ responses and CPAR[S] evaluations." *Id*. at AR14148. At bottom, its PPQ "d[id] not inspire confidence in Sterling's ability to perform the work required." *Id*.

And on the Japan HCW contract—the fifth contract Sterling submitted—Sterling "provided quality personnel that met or exceeded the required qualifications." *Id*. at AR14149. But the COR "did not have [a] good experience[] with management," and "would not award Sterling another contract." *Id*. at AR14149–50. Sterling failed to "meet[] some requirements," had "no support of performance issues," and had "less communication." *Id*. at AR14150. The

9

COR's complaints were "consistent with other past performance references and CPAR[S] evaluations [that] . . . Sterling struggled to fill positions in a timely manner" and "had difficulty managing its workforce and maintaining effective communication with the Government on a contract . . . much smaller than" the Solicitation.  *Id*.

The final past performance reference the Army considered was from a dental services task order in Germany, Italy, and Belgium.  Sterling, however, did not submit it; the Army separately sought out these assessments.  *Id*.  While there was one Satisfactory rating, the contracting officer "detailed thousands of hours of unperformed services on multiple positions" that led to a "limited ability to provide patient care."  *Id*. at AR14151.  The contracting officer's "remarks also described poor communication, failure to manage onboarding, illegible timesheets, and failure to follow the PWS requirements for provider time off."  *Id*.  The contracting officer "would not recommend Sterling Medical for future contracts."  *Id*.

The Army considered all the information before it, including Sterling's responses to the past performance evaluations, *id*. at AR14151–52, and assigned Sterling a "Limited" confidence rating.  *Id*. at AR14152–53.  While Sterling "has extensive and very recent relevant past performance, . . . it has trends of poor and worsening performance."  *Id*.  For example:

> [I]t does not consistently provide the required services, . . . includ[ing] poor communication with the Government, failure to retain HCWs, failure to recruit replacement HCWs, failure to backfill personnel with extended absences, slow response to employee performance/behavioral issues, provision of candidates that do not result in placement, inefficient HCW onboarding and documentation errors, and poor management of a disperse workforce.

*Id*. at AR14153.  Sterling's "failures resulted in numerous unperformed hours, extended vacancies, removal of contract employees, and detrimental impact on patient care that created additional workload for military and civilian HCWs.  These issues are not exclusive to one effort or contracting activity but have been recorded by several" contracting officers.  *Id*.  Sterling failed "to improve their performance" even though they had "years of experience."  *Id*.  In the end, the Army had a "low expectation that [Sterling] would successfully perform" the Solicitation, so the awarded performance rating was "'Limited' Confidence."  *Id*.

The record does not reveal any arbitrary or capricious action by the Army.  In fact, it refutes the protestor's portrayal of the Army's evaluation.  The Army recognized both the praiseworthy and the problematic in Sterling's performance history.  It acknowledged Sterling's successful performance in certain contracts, pointing to timely deliveries, acceptable technical outcomes, and several Satisfactory ratings on various parts of various contracts.  *See id*. at AR14130, AR14134, AR14140–42, AR14146, AR14152.  It then weighed the positive against the negative information: repeated delivery delays, quality control deficiencies, and sustained complaints from various contracting personnel.  *See, e.g.*, *id*. at AR14130–33, AR14135, AR14138–39, AR14145, AR14147, AR14151.  And it rationally arrived at the "Limited Confidence" rating.

10

Sterling's suggestion that the Army gave "short shift" to the positive aspects of its record, ECF No. 31 at 6, amounts to a disagreement with the Army's judgment of the relative weight to give the information, not a showing the evaluation was irrational. So Sterling's real complaint, then, is that the Army declined to allow the good in its record to outweigh the bad. But that is the quintessential sort of second-guessing in which this court may not partake. *Off. Design Grp.*, 951 F.3d at 1373 (citing *E.W. Bliss*, 77 F.3d at 449).

Indeed, "[e]ffective contracting demands broad discretion." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 990 (Fed. Cir. 2018) (quoting *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958–59 (Fed. Cir. 1993)); *Todd Constr., L.P. v. United States*, 88 Fed. Cl. 235, 248 (2009) (noting the discretion applied to past performance evaluations). Agencies possess a great deal of it, particularly in best value procurements. *Palantir*, 904 F.3d at 990. Finally, agencies "are not obligated to conduct all-encompassing discussions" on every matter addressed in an offeror's submission or on every matter at issue in the universe of information it can often consider. *Sentrillion Corp. v. United States*, 114 Fed. Cl. 557, 570 (2014) (quoting *CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 731 (1987)). The Army, for the reasons discussed, properly exercised its discretion. Far from ignoring key facts or contradicting the evidence, the Army stayed "within the bounds of reasoned decision-making." *Info. Scis. Corp. v. United States*, 80 Fed. Cl. 759, 773–74 (2008) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). It did what the FAR and Solicitation required: It considered relevant information (contemporaneous CPARS reports, PPQs, internal assessments), exercised its discretion, and offered a cogent explanation for why Sterling's past performance missed the mark. Thus, Sterling's protest on this ground cannot be sustained.

## 2.    The Army did not improperly weigh task orders versus contracts.

Sterling next challenges the weight the Army allegedly gave to the OCONUS dental task order. ECF No. 29 at 11. Recall that Sterling did not submit the OCONUS dental task order as part of its formal past performance package. *See, e.g.*, Tab 146b at AR11042. Rather, the Army compiled this information on its own.

Sterling's argument on this score proceeds as follows. The Solicitation detailed how the Army would evaluate past performance. ECF No. 29 at 10. It required offerors submit between three and five references for contracts performed or awarded during the three years from the Solicitation's issue date. It also "expressly exclude[d] [from the definition of contracts] 'individual delivery orders, task orders, blanket purchase agreements[,] or basic ordering agreements.'" ECF No. 31 at 12. The focus on contracts, Sterling says, "established a reasonable belief that past performance on 'contracts' would be the most important factor in the Army's review of an offeror's past performance."[6] ECF No. 29 at 10. On Sterling's reading of

---

[6] Sterling repeats and repeals this argument. For example, it later argues that the Army "failed to follow the objective Solicitation requirements defining the term 'contract' for the purpose of evaluating" past performance, that "[t]he Solicitation did not permit the Army to supplement the record," and that "the Army was not allowed to discard the Solicitation's requirement that it evaluate contract-wide references and instead focus the evaluation on task order details." ECF No. 29 at 35; ECF No. 31 at 12. This is completely contradictory to what Sterling has said elsewhere in its briefing. ECF No. 29 at 10 (understanding that "it was clear . . . the Army could

its past performance evaluation, the dental task order was the nail in the coffin for Sterling. *Id.* at 15–16 (insisting that the Army weighed the OCONUS dental task order "equally to the five contract PPQs that Sterling [] submitted" (emphasis omitted)); *id.* at 10 (arguing that "the repeated reference to 'contracts' meant that task orders and other forms of past performance should have carried less weight"). The record, however, reflects no such overreliance. Rather, the dental task order was one data point among many cited as illustrative of broader negative performance trends.[7] Without a solicitation-mandated weighting scheme, the Army exercised its appropriate discretion.

And Sterling admits, "the Army could review all sources of information relating to an offeror's past performance."[8] *Id.* The question, then, is whether the Solicitation mandates a certain amount of weight to apply to certain kinds of past performance. And here, no such language exists. Because the Solicitation lacked any provisions regarding the relative weight of contracts versus task orders, the relative weighting was committed to the Army's discretion, and it is a decision the court can disturb only if it was irrational. *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 126 (2021) ("[W]hen evaluating an offeror's past performance, [an agency] 'may give unequal weight,' or no weight at all, 'to different contracts when [the agency] views one as more relevant than another.'" (quoting *Seaborn Health Care, Inc. v. United States*, 101 Fed. Cl. 42, 51 (2011)). Here, the Army considered all the information before it and provided a reasoned basis for its rating. There is no basis for this court to substitute its judgment for the Army's.

3.    The Army appropriately discounted Vesa's CPARS.

---

[7] review all sources of information relating to an offeror's past performance"), 30 n.103 (reflecting Sterling's understanding that the "contracts" limitation applied to what offerors could submit in their proposals); ECF No. 31 at 34.

[7] To be sure, the Army gave Sterling a "Satisfactory Confidence" rating in its initial past performance evaluation, which was based on the same five references Sterling submitted in the second round of proposals. *See* Tab 65d. That evaluation, completed January 30, 2023, is sparse. The Army did not go into extensive detail, as it did in the second evaluation, completed November 20, 2024. *See* Tab 189d. The November 2024 evaluation is thorough, methodical, and amply reasoned. It considered more recent assessments of the contracts Sterling submitted, too.

[8] The GAO thoroughly explained why the Army properly considered the dental task order. Tab 203. "[A]n agency has discretion to determine the scope of the offerors' performance histories to be considered, provided all proposals are evaluated on the same basis and consistent with the solicitation requirements." *Id.* at AR16963. Indeed, it "is not limited to considering only the information provided within the 'four corners' of the offeror's proposal when evaluating past performance." *Id.* (citation omitted). Thus, the Solicitation "allowed the agency to consider a wide array of information from a variety of sources," and did not limit "the universe of information that the Army could consider." *Id.* at AR16963–94.

Sterling next argues that the Army unreasonably discounted Vesa's positive CPARS rating in its evaluation. ECF No. 29 at 14. This argument fares no better than the others.

Recall that Sterling submitted PPQs for the Coast Guard contract and for the Japan HCW contract. It performed on both as a subcontractor to Vesa, which is a wholly owned subsidiary of Sterling. The PPQ submitted for the Coast Guard contract provided "an overall 'Satisfactory' rating for performance mixed with individual item scores of both marginal and very good." Tab 189d at AR14146. It was issued on April 21, 2022. *Id.* When the Army conducted its new analysis in November 2024, it sought more recent CPARS reports because "the PPQ [wa]s more than two (2) years old" and "a new PPQ . . . was not submitted." *Id.* at AR14147. But because Sterling was the subcontractor on the contract, there were no CPARS for Sterling specifically. Still, the Army sent an EN to Sterling, providing an opportunity to respond to the adverse performance information in the PPQ from 2022. Tab 175 at AR13942–43. Sterling responded that "the most recent . . . [and] overall record of performance is definitely satisfactory." Tab 175a at AR13945. Indeed, the most recent CPARS showed satisfactory performance. But the Army discounted this because "the CPAR[S] was for Vesa Health and Technology, Inc, the prime contractor, not Sterling, the subcontractor." Tab 189d at AR14147. The Army clearly "acknowledge[d] Vesa's ratings," but explained "they were in spite of any poor performance on Sterling's part, not a rebuttal of the COR's PPQ assessment." *Id.* at AR14148. The "PPQ is the only specific evaluation of Sterling's performance on this contract and should not be discounted based on CPAR[S] ratings for the overall performance of the prime contractor." *Id.*

The PPQ for the Japan HCW contract gave Sterling "an overall '[U]nsatisfactory' rating for performance mixed with individual item scores of unsatisfactory, marginal, and satisfactory." *Id.* at AR14149. But that PPQ was also more than two years old when the second round of evaluations came around, and a new PPQ was not submitted, so more recent CPARS were reviewed. *Id.* at AR14149–50. Sterling was the subcontractor, so no records were found. *Id.* at AR14150. The Army sent an EN to Sterling so it could respond to adverse past performance information in the original PPQ. Tab 177 at AR13958–59. Sterling responded that Vesa's ratings "must be afforded precedence over" the PPQ. Tab 177a at AR13962. Again, "[b]ecause Vesa is the prime contractor, the CPAR[S] ratings and exercised options are a result of Vesa's overall performance despite the issues noted by the COR." Tab 189d at AR14150.

Sterling says "[t]he Army erred by . . . failing to follow the Solicitation evaluation [criteria] requiring the Agency to consider the past performance of proposed team members such as Vesa." ECF No. 31 at 11. It also complains that "the Army attributed all negative aspects of th[e] ratings to Sterling Medical, while dismissing any positive comments as being attributable only to Vesa's performance (or unknown)." ECF No. 29 at 14. In support of the proposition that the Army inappropriately disregarded Vesa's performance and CPARS, Sterling relies on the following language from the Solicitation: "Contracts may include efforts performed by the prime and any teaming arrangements projected to perform on any resultant contract." ECF No. 31 at 10 (citing Tab 25 at AR1574).

The Army's consideration of Vesa's CPARS was not arbitrary or capricious. Put simply, the Army did consider Vesa's performance. The Army acknowledged Vesa's positive CPARS. *See, e.g.*, Tab 189d at 14147–48. And the Army rationally explained why it considered the Sterling-specific PPQ more heavily than the Vesa CPARS—i.e., the PPQ was specific to

Sterling's performance while the CPARS was for Vesa's overall performance. In other words, Sterling simply believes the Army should have given it more credit for Vesa's performance than it did. But it is not for this court to reweigh the record before the Army.

        4.    <u>The Army appropriately assessed Sterling's trends.</u>

      Sterling also contends that the Army's consideration of its performance trends was arbitrary or capricious. ECF No. 29 at 13. Of the 218 CPARS reports the Army considered, 89 were for contracts and 129 were for task orders. *Id*. (citing Tab 156). The records for contracts "show[] 71.2% of the ratings are satisfactory, 23.2% very good or exceptional, and only 5.6% are negative." *Id*. The records for all 218 show "80.1% . . . being satisfactory, 11% being very good or exceptional, and 8.9% being negative." *Id*. Thus, Sterling says, "[s]uch numbers do not support" the Army's negative rating or a trend of "'poor and worsening' performance." *Id*. Instead, "the positives consistently outweigh[ed] the negatives." *Id*. Ultimately, Sterling contends, "[i]f the Army had weighed the ratings . . . [properly] (*i.e.*, looked at [contracts alone]) or focused on both positive and negative information, it would have . . . come to the same conclusion it reached when it first evaluated Sterling Medical's past performance, noting Satisfactory Confidence." *Id*. at 13–14.

      But the Army did not pluck the "Limited Confidence" rating from the ether. Unlike the Army, as the Government points out, Sterling did not "consider the recency and relevancy of the underlying past performance information." ECF No. 30 at 22. Nor did Sterling compare older and newer records "to counter the Army's determination of Sterling's negative trend of performance." *Id*. The more recent records, spanning several years, show "trends of poor and worsening performance," through evidence from "various contracting activities" that "demonstrate[ed] Sterling's failure to recruit, place, and retain personnel, 'result[ing] in numerous unperformed hours, extended vacancies, . . . and detrimental impact on patient care.'" *Id*. at 18–19 (quoting Tab 189d at AR14153).

      In sum, Sterling's argument amounts to the same subjective disagreement the court has rejected. So here too the record offers the "coherent and reasonable explanation" that *Impresa* requires. *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l*, 19 F.3d at 1356).

        5.    <u>The Army appropriately relied on challenged CPARS ratings.</u>

      Sterling contends the Army acted irrationally when it relied on challenged CPARS ratings in its past performance evaluation. ECF No. 29 at 12 (arguing that it "unreasonable and an abuse of discretion" for the Army to "rel[y] upon CPARS reports that it knows Sterling . . . has challenged"). But this argument finds no purchase in law or regulation.

      Sterling has filed claims challenging two of its CPARS ratings—one for task order No. W9114F19F0057, and another for task order No. W9114F9F0060. Sterling says it left comments in the CPARS system reflecting its objections, but the Army did not change the ratings. *Id*. Once the comments were closed, the CPARS ratings became final even though Sterling had submitted claims under the Contract Disputes Act ("CDA") challenging the ratings.

*See Sterling Med. Assocs., Inc. v. United States*, No. 25-811 (Fed. Cl. filed May 12, 2025); *Sterling Med. Assocs., Inc. v. United States*, No. 25-814 (Fed. Cl. filed May 12, 2025).[9]

The Army considered the challenged CPARS in its past performance evaluation even though it knew of the CDA claims. Sterling argues that this consideration of them, "without even a passing reference to [its] rebuttal" or the CDA claims "does not demonstrate fairness." ECF No. 29 at 13. That, according to Sterling, violates FAR 15.305. *Id.* Sterling cites no other authority for its claims.

The Army's decision to consider the CPARS reports was not arbitrary or capricious, nor did it violate FAR 15.305. The pendency of the CDA claims provided no basis to ignore the reports and their ratings. In fact, it would have been unreasonable *not* to consider them; the CPARS were finalized, and the law requires contracting officials to consider past performance information and a contractor's comments. 48 C.F.R. § 15.305(a)(2)(ii) ("The Solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance."). That is what the Army did. It reviewed Sterling's comments on the reports before finalizing the ratings. And in the evaluation, the Army explained why it did not find Sterling's objections to the ratings and their performance persuasive. Tab 189d at AR14152.

Sterling's next argument that the Army erred by considering the challenged CPARS reports simply invites the court to reweigh the information regarding past performance. Again, that asks the court to wander outside its bailiwick and assume the role of the Army. The court declines the invitation. In any event, that Sterling provided explanations for its past performance problems "does not mean that [the Army] was required to accept th[o]se explanations, nor did it change [Sterling's] historical past performance. Instead, the [Army] had discretion to state that, after considering the evidence on both sides," it found Sterling's past performance deficient. *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1359 (Fed. Cir. 2015). Sterling's approach would require agencies to disregard any negative evaluation that a contractor contests, giving offerors the ability to shield negative past performance from consideration merely by filing a CDA claim. If Congress or the FAR Council envisioned such a system, they would have explicitly provided for it.

In short, the Army's reliance on a finalized CPARS evaluation—despite Sterling's continuing dissatisfaction—was rational. As with its other objections, Sterling's disagreement reflects a difference of opinion, not a defect in process or rationality. It thus offers no basis for disturbing the Army's award decision.

### B.    The Army adequately documented its decision regarding the consideration of Vesa's CPARS report versus Sterling's PPQ.

---

[9] Sterling contends that this differed from how the Army treated [ * * * ]'s proposal because the Army did not consider challenged CPARS ratings in its evaluation. ECF No. 29 at 12–13. But the challenged CPARS in [ * * * ] were not closed out, Tab 189c at AR14126, as they were for Sterling. So it was appropriate for the Army to not consider [ * * * ]'s challenged CPARS.

Sterling next challenges the Army's alleged failure to substantiate some of its decision, arguing that it "did not properly document the basis for its conclusions with respect to its review of Sterling Medical's performance as a subcontractor." ECF No. 29 at 18. Sterling contends the Army did not "review[] the CPARS for the two contracts [it] presented for its work as a subcontractor," but "merely reviewed [its] responses to ENs . . . and came up with unsupported assumptions based upon them." *Id.* Sterling adds, "[t]here is no record anywhere . . . that either provides a basis for the Army's conclusion that 'Vesa's ratings' were issued 'in spite of any poor performance on Sterling's part' or describes how the Army reached that determination." *Id.* Sterling asserts that this was arbitrary or capricious under *Caddell Construction Co. v. United States*, 111 Fed. Cl. 49 (2013). In that case, the source selection authority provided no contemporaneous explanation for his decision to award the contract. *Id.* at 108. The decision was conclusory, inconsistent, and lacked supporting rationale. *Id.* at 108.[10]

This record does not reveal any lack of explanation like the court faced in *Caddell*. Instead, the record here allows the court to "reasonably discern" the Army's rationale. *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) (citation omitted). It made sense for the Army to rely more heavily on the PPQ regarding Sterling than on Vesa's CPARS. Again, the PPQ was "the only specific evaluation of Sterling's performance" as a subcontractor. Tab 189d at AR14148. The PPQ included several "Marginal" scores and poor feedback directly from the contracting officer, explaining that Sterling struggled to find quality candidates and was not proactive about managing conflict. *Id.* The Army then considered Vesa's positive CPARS report, but did not give it as much weight because it was for Vesa's performance on the entire contract, not Sterling's performance specifically (like the PPQ was). That, combined with an extensive amount of negative ratings and reports regarding Sterling's performance, rationally led to a "Limited Confidence" rating. The court will not second-guess the Army's rational and supported decision to discount the Vesa's CPARS in evaluating Sterling.

## C.    The Army did not rely on unstated evaluation criteria.

Next, Sterling argues the Army relied on unstated evaluation criteria when evaluating the OCONUS dental task order and the Victim Advocacy contract. ECF No. 29 at 15–17. It did not.

It is a truism that agencies must play by the rules they write. Thus, they are bound to evaluate proposals according to only the criteria set forth in the solicitation. *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020). To make out an unstated evaluation claim, Sterling must show the agency "used a significantly different basis in evaluating the proposals than was disclosed." *Wellpoint Mil. Care Corp. v. United States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020). That said, an agency does not need to enumerate every detail of its consideration. The agency retains "great discretion in determining the scope of an evaluation factor." *Banknote Corp.*, 56 Fed. Cl. at 386 (quoting *Forestry Survs.*, 44 Fed. Cl. at

---

[10] Sterling also speculates that "[i]f the Army had reviewed the CPARS, . . . [it] would have seen that the issues of concern had been rectified." ECF No. 29 at 18–19. This court will not, and cannot, give any weight to such unfounded speculation.

499).  So long as the agency remains within the bounds of its solicitation, the challenged action
will survive.

> 1.    The Army did not rely on any unstated evaluation criteria when evaluating
>        the OCONUS dental task order.

Begin with the OCONUS dental task order.  Sterling says the Army created a negative
PPQ and somehow arrived at a "very relevant" past performance rating, allowing it to give the
task order "the same weight as . . . [the] other Contract PPQs which actually did meet the
Solicitation's requirements."  ECF No. 29 at 16.  Sterling speculates that had the task order
"been weighted properly, it would have carried less weight, and as such, created a critical
difference in the overall evaluation of Sterling Medical's past performance."  *Id.*  Not so.
Nothing in the record evinces the arbitrary or capricious decision-making sufficient to overturn
the Army's decision.

To begin, it is not entirely clear what Sterling argues was an unstated criterium rather
than just failing to follow the Solicitation.  To the extent Sterling's argument is that it was
improper to create and consider the PPQ regarding a task order rather than a contract, that
argument fails.  As the Solicitation makes clear, the Army could consider any information
regarding performance risk, whether a contract or task order.  Tab 25 at AR1574.  This is the
same reason the GAO denied Sterling's protest challenging the consideration of the task order
performance rather than contract performance.  *See* Tab 203.  It was thus permissible for the
Army to ask the OCONUS dental contract's contracting officer to provide the information in a
PPQ about the task order that he was administering for performance in Germany and Italy.

Sterling's next unstated criteria argument, however, appears to argue not that there was
unstated criteria relied on, but that the Army did not follow the stated criteria.  Specifically,
Sterling argues that the Army found the OCONUS dental contract for the European theatre "very
relevant," when Sterling believes that it could not get anything above a "somewhat relevant"
rating because it was roughly one-third the value of the Solicitation work.[11]  ECF No. 29 at 16.
But the Army determined the task order in Europe was relevant because "[t]he privileged dentists
have similar levels of education and credentials as privileged ADCMS providers and several of
the performance locations [in Europe] . . . are the same as the RFP."  Tab 189d at AR14151.
Further, "[b]oth [the Solicitation and the OCONUS dental task order] require successful
recruitment and relocation of HCWs from CONUS to OCONUS, DOCPER/SOFA onboarding
and retention of HCWs in Germany and Italy, performance in MTFs, and the management of a
geographically dispersed workforce."  *Id.*  In other words, the Army concluded that the
OCONUS dental task order was to provide similar services and shared much of the complexities
of the Solicitation.  And the Army considered the difference in dollar value as well, concluding
that although "the dental contract is approximately one third of the value of the RFP . . . [it] has
the same critical functions and complexities as the ADCMS RFP."  *Id.*  Thus, the Army
recognized and considered the difference in dollar value but concluded that alone was not
sufficient to downgrade the relevance of the OCONUS dental task order.  That was rational
given that the relevancy determination was based on the "similarity of service/support,

---

[11] In fact, Sterling only concedes that the Army "*might*" be able to rate the dental program as
"somewhat relevant."  ECF No. 29 at 16 (emphasis in original).

complexity, dollar value, contract type, and degree of subcontract/teaming." Tab 25 at AR1574. The court cannot say that just because one factor—the dollar value—was less than the Solicitation, the Army was arbitrary or capricious in its conclusion that this task order was "very relevant."

Sterling also implies that the Army applied an unstated criterium when it chose not to consider Sterling's performance of the OCONUS dental task order for Korea, which was issued under the same contract as the task order for Germany and Italy. Tab 150a at AR11382. Sterling's performance in Germany and Italy was "Unsatisfactory." Tab 189d at AR14151. There was "a cure notice for unperformed services, mismanaged time off, and failure to backfill a position vacant due to unscheduled leave." *Id*. And the contracting officer "would not recommend award of another contract to Sterling[.]" *Id*. (noting "thousands of hours of unperformed services on multiple positions" and an "impact to patient care"). Here, the Army provided Sterling an EN so it could respond to the poor performance information. *See* Tab 150a. Sterling's response to the EN about Germany and Italy included data for the task order in Korea. *See id.* at AR11382. The Army discounted this information because there were different contracting officers and it was "irrelevant to Sterling's performance in Germany and Italy." Tab 189d at AR14151. Sterling argues there were unstated evaluation criteria allowing the Army to conclude that the European task order was very relevant and the Korea task order irrelevant. ECF No. 29 at 16–17.

It was not irrational for the Army to do so, and the record bears no indication that the Army conjured extraneous metrics. The EN was specific to the European theatre and did not ask about performance in Korea. The Army determined the task order in Korea was not relevant because it was administered by a different contracting officer and not at issue in the PPQ for the European task order. Tab 189d at AR14151. That determination—to assess the European task order but not the Korean one—was not the result of any unstated criteria. The Army could rationally disregard the extraneous information in the response to the EN without relying on any unstated criteria.

So then, Sterling does not identify how this is a "significantly different basis" to evaluate proposals than was disclosed in the Solicitation. *Samsara, Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024). Instead, Sterling merely reiterates its subjective disagreement with the evaluation. The Army adhered to the Solicitation's announced factors and those factors alone. It considered "a wide array of information from a variety of sources," and nothing barred the consideration of the European dental services task order. Tab 25 at AR1574–75.

> 2.    The Army did not rely on any unstated evaluation criteria when evaluating the Victim Advocacy contract.

Sterling's second unstated evaluation criteria argument relates to its Victim Advocacy contract. ECF No. 29 at 17. It argues that the Army improperly considered pricing in the past performance evaluation. *Id.* But that is not what happened.

During performance of the Victim Advocacy contract, the contracting officer for that contract became aware of ongoing vacancies. So he "asked Sterling to complete a spreadsheet detailing unfilled positions." Tab 189d at AR14131. The response led to "surprise[] at the high

number of vacancies" because the contracting officer "had been unaware of the widespread issues." *Id.* In response, the contracting officer met with Sterling's project manager, who "was very candid about her difficulty recruiting and filling contract positions." *Id.* The cause? According to Sterling's project manager, "Sterling's compensation package is 'much less' than the [Victim Advocates]'s GS equivalents. Once contract [Victim Advocates] become aware of the disparity, they leave Sterling for GS jobs." *Id.* Given the stress of victim advocacy roles, Sterling's project manager explained that "wages [are] more consequential to recruiting and retention." *Id.* The contracting officer was "not optimistic that Sterling's salary w[ould] be competitive." *Id.* Based on this information, the contracting officer for this procurement concluded during his performance evaluation that Sterling's heavy reliance on remaining Victim Advocates to cover vacancies contributed to turnover problems, which likely worsened "after indications that Sterling's compensation is not competitive with GS equivalent positions." *Id.* at AR14133.

In other words, the Army did not consider Sterling's pricing on its Victim Advocacy contract. Rather, the Army considered the comments from Sterling's project manager regarding the difficulties she was having filling positions. And it was Sterling's project manager that identified compensation as a significant cause of employee turnover and difficulty attracting qualified personnel. Crediting a Sterling project manager's explanation of Sterling's difficulties filling positions does not equate to considering pricing methodology; it is a rational part of a past performance evaluation.

Sterling's reliance on *Centerra Security Services GMBH v. United States*, 176 Fed. Cl. 219 (2025), is not convincing. ECF No. 29 at 17. There, the Army sought armed security services for installations throughout Germany. *Centerra Sec.*, 176 Fed. Cl. at 225. The solicitation directed the Army to assess recency and relevancy based on scope, magnitude, and complexity. *Id.* at 235. It did not reference geographic location or contracting agency. The Army disregarded the solicitation and downgraded Centerra's past performance because its reference had not been performed in Germany and were not DoD contracts. *Id.* "Germany- and DoD-specific experience" had never been disclosed to offerors and were extraneous to the criteria the agency said it would apply. *Id.* at 236. But that is not the case here. The Army's evaluation rested on its acceptance of Sterling's project manager's explanation for staffing shortfalls. The concern about compensation was not a separate factor; it was that low wages led to high turnover and hiring delays—according to Sterling's own project manager. Past performance evaluations are meant to identify these issues.

In sum, the Army did not rely on unstated criteria. It relied on what the FAR and the Solicitation invited it to assess: Whether, considering "a wide array of information from a variety of sources," the offeror's performance history suggests a reliable likelihood of successful future performance. Tab 25 at AR1574. Where poor compensation drove performance degradation, the Army acted well within its discretion in factoring that into its assessment, and did not "use[] a 'significantly different basis in evaluating the proposals than was disclosed.'" *FreeAlliance.com, LLC v. United States*, 173 Fed. Cl. 598, 607 (2024) (quoting *Poplar Point*, 147 Fed. Cl. at 219).

**D.    The Army did not treat offerors disparately.**

Sterling lodges two core disparate treatment claims.[12] Its first argues that the Army improperly considered Global's performance because Sterling contends that Global did not submit past performance for each member of the joint venture. ECF No. 29 at 21–22. Its second claim alleges that the Army assessed Global's past performance disparately from its consideration of Sterling's proposal. *Id.*

Sterling has two ways to show it suffered disparate treatment. First, it could show that the Army "unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp.*, 951 F.3d at 1372. Or it could show "that the agency inconsistently applied objective solicitation requirements between it and other offerors. . . ." *Id.*

As an initial matter, while Sterling contends that the Army disparately applied objective criteria, *see* ECF No. 31 at 13, the court is not convinced. Sterling alleges that the "recency, relevancy, quality, and the Army's overall performance confidence ratings" are "objective requirements." *Id.* at 12. The court struggles to see how that could be the case. Other than recency, which is defined in the Solicitation with objective terms (i.e., 24 months of performance within the preceding 36 months), each remaining factor involves the Army's exercise of discretion and judgment. The inconsistent application of objective solicitation requirements holds true for criteria like "proposal page limits, formatting requirements, or submission deadlines." *Off. Design Grp.*, 951 F.3d at 1372. For example, the government could treat offerors disparately if a solicitation required that anyone filling a position must have a bachelor's degree and the government ignored the requirement for one party but enforced it as to another. Assume, however, that both parties submitted proposals to use individuals with bachelor's degrees and the government found one person's resume and experience superior to the other. That is not disparate treatment because the people proposed to fill the role are not substantively identical.

1.    The Army did not treat Sterling and Global disparately in considering the performance of affiliates.

Sterling first argues that the Army did not credit it with Vesa's past performance, while doing so for Global's JV members. ECF No. 29 at 23. The Army could "attribute the experience or past performance of a parent or affiliated company," if the offeror "demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror." *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 188 (2014) (quoting *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 747 (2008)), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015). This, in fact, is encouraged. An "individual contractor or subcontractor may be composed of hundreds of legal entities, and it would create a heavy burden to require every individual entity that is to be involved in a proposed contract to independently certify its involvement, and an equally heavy burden on the agency to verify each entity." *Id.* at 193. And the requirement to explain the entity's role in performing the contract ensures the Government is evaluating the

---

[12] Sterling also complains that [ * * * ] and [ * * * ] did not have enough past performance to evaluate one way or another, but the Army did not exclude them from competition. ECF No. 29 at 20. [ * * * ], however, withdrew from consideration, and the Army awarded the contract to Global. So, even if true, Sterling would not be able to establish prejudice.

parties that will be performing.  So "long as the proposal or evaluation notice makes it clear 'that the resources of the parent or affiliated company will affect the performance of the offeror,' the past performance references of the parent or affiliate can be acknowledged."  *Id.* at 188 (quoting *Femme Comp Inc.*, 83 Fed. Cl. at 747).

Global is a JV comprising four members: Decypher Technologies, Ltd. ("Decypher"); Wellpath, LLC ("Wellpath"); Ridgewood Government Services, LLC ("Ridgewood"); and BFrench Consulting, LLC ("French Consulting, LLC").  Tab 144c at AR10675.  Global's initial proposal identified French Consulting, LLC, as the member, while the text of the agreement identifies BFrench Consulting, GMBH ("French Consulting, GMBH") as the member.  Tab 33 at AR2507–08.  The Parties do not dispute that French Consulting, LLC is an affiliate of French Consulting, GMBH.  ECF No. 29 at 23–24; ECF No. 30 at 30 n.13.  Global submitted one past performance reference for Ridgewood, one for Wellpath, one for Decypher, and two for a Wellpath subsidiary.[13]  Tab 189b at AR14118.  It did not submit a past performance reference specifically for either French Consulting, LLC, or French Consulting, GMBH.  But its Ridgewood reference identified French Consulting—it appears to be for French Consulting, LLC—as a partner on the contract.  Tab 144c at AR10678.  Here, there was no PPQ for its past performance submission, but Global's proposal explained where and in what capacity French Consulting, LLC would be performing.  *See, e.g.*, Tab 33 at AR2497, Tab 33a, Tab 144c at AR10675.  Thus, considering the CPARS ratings of French Consulting, LLC, as an affiliate of French Consulting, GMBH, was proper.

Sterling next asserts the Army's decision to credit Global with the past performance of French Consulting, LLC, even though French Consulting, GMBH was the member, amounted to disparate treatment because the Army did not credit Sterling for Vesa's performance.  ECF No. 29 at 21.  In other words, Sterling contends that because the Army credited French Consulting, LLC's performance for Global, it was disparate treatment for the Army not to credit Sterling with Vesa's performance.  *Id.*

But the Army did credit Vesa's performance—it just afforded the performance less weight to it than Sterling believes the Army should have.  Several pages of the past performance evaluation discuss Vesa's and Sterling's performance on the Coast Guard contract.  Tab 189d at AR14146–48.  On that contract, Sterling was Vesa's subcontractor (Vesa was a subsidiary of Sterling) and performed 49% of the work.  *Id.* at AR14146.  Vesa earned positive CPARS ratings, which the Army summarized and discussed in the evaluation.  *Id.* at AR14146–47.  The Army then "acknowledge[d]" those ratings when considering how much weight to give Vesa's CPARS and Sterling's PPQ.  The Army thought the information in the PPQ that was specific to Sterling's performance rather than the CPARS covering entire contract was more relevant.  *Id.* at AR14147–48.  That is not disparate treatment under either *Office Design Group* theory.  The Army did not apply objective criteria differently—it considered the performance references for affiliates of Sterling and of Global.  The fact that the performance evaluations that it considered

---

[13] These "were performed by Correct Care Australasia, a subsidiary of Wellpath."  Tab 189b at AR14120.  The Army did not review these contracts because Global's proposal "d[id] not specify the type or extent of Wellpath's direct involvement in the contracts' performance."  *Id.*

were not substantively indistinguishable means that there was no disparate treatment in reaching different performance risk ratings based on the different evaluations.

The same is true for the evaluation of Vesa's Japan HCW contract. Sterling on this contract also performed 49% of the work. Tab 189d at AR14148. And like the Coast Guard contract, Vesa had more positive CPARS ratings than Sterling had in its PPQ. *Id.* at AR14150. Again, the Army placed more weight on the PPQ specific to Sterling than it did the CPARS for the entire contract. *Id.* That undermines any disparate treatment because the Army followed the objective criteria for both Sterling and Global—it evaluated the affiliate's performance in each. And Global's and Sterling's different performance led to different evaluations, which was not disparate treatment because their performance was not substantially indistinguishable. In the end, as this court previously expressed, it is "not disparate treatment for the Agency to evaluate different proposals differently." *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 110 (2023).

### 2.    The Army did not disparately assess the offerors' performance trends.

Sterling's second disparate treatment argument concerns the Army's consideration of the trends in past performance. When evaluating performance risk, the Army looked at Sterling's performance and recognized a trend of recent, lower ratings. Tab 189 at AR14111–13. Sterling asserts the Army was purportedly "more generous in its evaluation of Global's members than it was of Sterling Medical['s] when reviewing the more recent record of past performance." ECF No. 29 at 27, 29–33; ECF No. 31 at 12–16. Specifically, Sterling argues that had the Army similarly evaluated Global, it would have seen a negative trend in its performance. ECF No. 29 at 29–30.

Here too Sterling insists that the Army highlighted its negatives while brushing away Global's negatives. According to Sterling, "the Army described any flaws referenced in Decypher's performance records much more generously than it did for the same or more minor flaws in Sterling[]'s performance history." *Id.* at 31. And Sterling contends "[t]he Army's generosity toward . . . Wellpath [was] . . . [u]nlike its approach to Sterling" because "the Army minimized any negative information in Wellpath's record of performance as mere 'blemishes.'" *Id.* at 31–32. But it is hard to understand this as a disparate treatment argument. Put simply, the Army considered different performance evaluations differently. That is not disparate treatment.

In any event, the court has no basis (other than Sterling's subjective disagreement) to disturb the Army's finding of a negative trend in Sterling's past performance based on record evidence. Sterling had two marginal ratings for periods ending in FY 2021, 4 marginal or unsatisfactory ratings for periods in FY 2022, 6 marginal ratings for FY 2023, and 3 marginal ratings in the first half of 2024. Tab 189d at AR14134. The Army similarly rationally found Global to be a strong choice. It noted and assessed negative parts of Global's members' performance but found its extensive positives outweighed the bad. The Army recognized some issues with Decypher's vacancies but noted the overwhelming "Very Good" ratings. Tab 189b at AR14122–23. And for Wellpath, the PPQ from the initial evaluation provided an "Exceptional" rating, and the comments "were very positive." *Id.* at AR14121. CPARS from

the time spanning evaluations mirrored that assessment; in fact, "ratings improved over time."[14] *Id.*  The record comfortably supports the Army's conclusions.

**E.    There is no basis to exclude Global from consideration.**

The remainder of Sterling's arguments are similarly unpersuasive.  It says that the Army should have treated Global's proposal as noncompliant because it purportedly did not include past performance information for each of Global's joint venture members.  According to Sterling, however, Global's failure to submit past performance references for French Consulting, GMBH "should have been grounds for finding Global noncompliant and rejecting its offer."  ECF No. 29 at 21–22.  There is no basis for such an exclusion.

The Solicitation instructed that, for offerors who are JVs without past performance, the offeror shall "submit past performance of each party to the joint venture."  Tab 25 at AR1554, AR1574.  Taking Sterling's interpretation to its logical conclusion would mean that an offeror with more than five members would be ineligible.  That is nonsensical.  The logical conclusion is these provisions instruct JV offerors to select up to five past performance references from the JV members' experience.  It is true that Global did not submit a past performance reference specifically for French Consulting GMBH.  But that is not disqualifying.  Again, the Solicitation allowed offerors to submit past performance of affiliates.  And there is no dispute that French Consulting LLC is an affiliate of French Consulting GMBH, and that Global's proposal explained how it would use French Consulting LLC.  And Ridgewood's contract PPQ discusses French Consulting, LLC's performance, too.  Tab 144c at AR10678.  Finally, the Solicitation instructs the Army to "consider the past performance of each party the joint venture."  Tab 25 at AR1574.  That is what the Army did.

**F.    Sterling's subjective disagreement with the evaluation does not provide a basis to disturb the Army's evaluation.**

Sterling says the Army acted irrationally because "it failed to either recognize or evaluate the gap in Global's past performance proposal" and that the CPARS for French Consulting, LLC were "significantly less complex and of a much lower value . . . than the Solicitation."  ECF No. 29 at 26; ECF No. 31 at 17.  That first argument fails because the Army complied with the Solicitation: it rationally assessed French Consulting, LLC's past performance through two CPARS reports and the Ridgewood PPQ.  And the second fails because that is simply a subjective disagreement with the Army's evaluation, which the court may not credit.  *See supra*.

**G.    Injunctive Relief**

Because success on the merits is required for injunctive relief, and Sterling has not prevailed on the merits, the court denies Sterling's motion for an injunction.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

---

[14] Sterling complains the Army did not consider Wellpath's bankruptcy proceedings or its owner's False Claims Act cases.  ECF No. 29 at 32.  But that is extra-record evidence.  Should Sterling have wished to supplement the record, it should have moved to do so.

**IV.    Conclusion**

For these reasons, the court **DENIES** Sterling's motion for judgment on the administrative record, ECF No. 29, **GRANTS** the Government's motion for judgment on the administrative record, ECF No. 30, and **DIRECTS** the Clerk's Office to enter judgment accordingly.

It is so ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge